# IN THE COURT OF APPEALS OF IOWA

No. 13-1497
Filed June 10, 2015

IN THE MATTER OF E.L.,
Alleged to be Seriously
Mentally Impaired

E.L.,
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Mary E. Chiccelly

(involuntary commitment) and Sean M. McPartland (writ of habeas corpus),

Judges.


        A respondent challenges his involuntary commitment under Iowa Code

chapter 229 (2013).  **AFFIRMED.**


        Kelly D. Steele, Cedar Rapids, for appellant.

        Thomas J. Miller, Attorney General, Gretchen Witte Kraemer, Assistant

Attorney General, Jerry Vander Sanden, County Attorney, and Matt Kishinami,

Assistant County Attorney, for appellee.


        Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

E.L. contends the district court wrongly determined he was seriously mentally impaired and required involuntary hospitalization. Specifically, he argues the State did not present evidence of recent overt acts sufficient to show he posed a danger to himself or others as required by Iowa Code section 229.1(17) (2013). Because we find substantial evidence in the record to support the finding E.L. was assaultive and threatening before his involuntary commitment, we affirm.

## I.    Background Facts and Proceedings

E.L. arrived in Iowa in the spring of 2013, according to the staff at the Abbe Center Transitional Living Program in Cedar Rapids. Area shelters referred E.L. to the Abbe Center due to his disruptive behavior and delusions. The Abbe Center set him up with an apartment. But the apartment manager complained to Abbe Center staff that E.L. was screaming, swearing, and threatening others in the parking lot. Witnesses also saw E.L. throwing items off a second floor deck because he believed they were "possessed."

On August 15, 2013, Abbe Center staff members sought to have E.L. involuntarily committed because they believed he was a danger to himself and others. Staff member Carmen Johnson filed an affidavit in support of the application for an order of involuntary hospitalization. The affidavit said E.L. had become "increasingly psychotic" over the previous two weeks. E.L.'s behavior included "yelling vulgarities at the staff," "grabbing himself (sexually) in public while screaming about rapists," and "screaming racial slurs, threats, etc." to staff,

neighbors, and strangers. Neighbors expressed their fear of E.L. Police were called to avoid escalation.

Psychiatrist Jeffrey Wilharm admitted E.L. into St. Luke's Hospital on August 16, 2013. Dr. Wilharm noted E.L. engaged in assaultive and threatening behavior on the day before the hospitalization. On August 21, 2013, the hospitalization referee found E.L. needed to be involuntarily committed because he was "assaultive & threating." E.L. appealed that ruling and filed a writ of habeas corpus. The district court held a hearing on September 9, 2013.

At the hearing, Dr. Wilharm testified he had seen E.L. previously in May 2013. E.L. had a diagnosis of schizophrenia. Dr. Wilharm testified E.L. "can get disoriented, and at times can get very suspicious and formulate thoughts and patterns of behavior that aren't based on reality." The psychiatrist further testified E.L. could "get paranoid at times" and when he acted on his paranoia it led to his "hospitalization situations."

Dr. Gregory Keller also testified at the hearing. Dr. Keller took over E.L.'s care on August 23, 2013, at the Clarinda Mental Health Facility. In a report admitted as an exhibit at the hearing, Dr. Keller stated E.L. had been treated in the past for schizo-affective disorder, bipolar type and paranoid schizophrenia. Dr. Keller also concluded E.L. was likely to injure himself or others. The report included the question "What overt acts have led you to conclude [E.L.] is likely to physically injure himself or others?" Dr. Keller responded, "If he were to go untreated . . . his thinking, mood and behaviors would rapidly decompensate, leading to events similar to those that brought him to the hospital, which included

episodes of yelling at this apartment complex and at local businesses disturbing many people that were around him."

E.L. also took the stand, testifying he did not injure anyone and did not pose a danger to himself.

On September 10, 2013, the district court affirmed the finding of the hospitalization referee. The court held: "E.L.'s threatening and assaultive behavior presents a danger to people around him." The court also denied E.L.'s petition for writ of habeas corpus.

E.L. filed another petition for writ of habeas corpus, which was denied at a hearing on December 16, 2013, when the parties agreed he was receiving outpatient therapy and not confined for the purposes of Iowa Code section 229.37.[1] E.L. now appeals his involuntary hospitalization, claiming the record did not support the conclusion that he was a danger to himself or others.

## II. Standard of Review

"We review challenges to the sufficiency of the evidence in involuntary commitment proceedings for errors at law." *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). The State must prove the allegations in an involuntary commitment proceeding by clear and convincing evidence. *Id.* Clear and convincing evidence means "there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.* (quoting *In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998)). This clear-and-convincing evidence standard is less onerous that proof beyond a reasonable doubt. *Id.* at 342.

---

[1] On September 3, 2014, the Iowa Supreme Court ordered the appeals combined. E.L. does not raise an issue concerning the writ of habeas corpus in this appeal.

**III.    Mootness**

The State argues this appeal is moot and attempts to distinguish *B.B.*, 826 N.W.2d at 431.  In that case, our supreme court held, because of the stigma associated with serious mental impairment, involuntary commitment cases are not moot even if the person has been released from the commitment.  *Id.* at 430–31.  But *B.B.* left open the possibility that "a series of recent, successive involuntary commitments that were either not appealed or upheld on appeal might effectively remove any stigma resulting from a later involuntary commitment proceeding."  *Id.* at 432.

E.L. was discharged from treatment and his commitment was dismissed on December 3, 2014.  The State argues because E.L. was dismissed from his current commitment and had "several prior recent hospitalizations," this appeal should be considered moot.

The record before us does not show E.L. had a succession of prior involuntary commitments which were not appealed or were upheld on appeal. The record refers to two hospitalizations earlier in 2013, but gives no context to those hospitalizations.  Accordingly, we cannot find this case stands as an exception to *B.B.  See id.*  As a result, we turn to the merits.

**IV.    Serious Mental Impairment**

For purposes of involuntary hospitalization, a person is seriously mentally impaired if he suffers from mental illness,

> [A]nd because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria:

      a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
      b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.
      c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.

Iowa Code § 229.1(17).

Under this statute the State must prove three elements: (1) the person has a mental illness and because of that illness, (2) the person lacks sufficient judgment to make responsible decisions with respect to his hospitalization or treatment, and (3) is likely to inflict physical injury on the person's self or others or is unable to satisfy the person's physical needs. *See J.P.*, 574 N.W.2d at 343.

E.L. does not dispute he was diagnosed with a mental illness or that because of the illness he lacked the judgment to make responsible decisions about his hospitalization and treatment. Instead, he claims there is insufficient evidence in the record to support a finding he was likely to physically injure himself or others. He asserts the State did not establish he caused physical injuries or made threats of a physical nature. He contends references during the hearing to him "yelling" and "disturbing" people were not sufficient "overt acts" to undergird the "endangerment" element. According to E.L., "there is no reference to any threats or acts involving likely physical injury to any person."

In interpreting section 229.1(17), the term "likely" means "probable or reasonably to be expected." *In re Oseing*, 296 N.W.2d 797, 801 (Iowa 1980). The statutory provision "requires a predictive judgment, based on prior

manifestations but nevertheless ultimately grounded on future rather than past danger." *Id.* The danger a person poses to himself or others must be evidenced by a "recent overt act, attempt or threat." *See J.P.*, 574 N.W.2d at 344 (citing *In re Mohr*, 383 N.W.2d 539, 542 (Iowa 1986)). Behavior that is socially unacceptable, standing alone, does not satisfy the overt act requirement. *Mohr*, 383 N.W.2d at 542. Rather, an "overt act" implies past aggressive behavior or threats that manifest in the probable commission of a dangerous act upon the respondent himself or others. *In re Foster*, 426 N.W.2d 374, 378–79 (Iowa 1988) (holding verbalized delusions do not constitute the type of overt act necessary to establish dangerousness).

The State agrees a recent overt act is required to prove the endangerment element of a civil commitment. The State contends the testimony of E.L.'s treating physician, Dr. Wilharm, satisfied the requirement to show the respondent engaged in recent overt acts signaling the likelihood of injury to himself or others.

Dr. Wilharm testified E.L.'s "misinterpretation of reality" led to an assault. The psychiatrist explained:

> I think he felt he was acting on behalf of protecting someone, but it turned out that it became an assault situation. I think at times he has had some comments and made some threats to others as well that certainly I think would be putting both he and the other person at risk of possibly leading to some kind of physical altercation as well.

In his own testimony, E.L. acknowledged being involved in a contentious interaction with two other people that required police intervention. E.L. denied assaulting anyone, but acknowledged the police "asked us to stay away from each other."

The evidence supporting the endangerment element is stronger here than it was in *Foster*. In that case, the doctor conceded Foster was not the aggressor in the incidents at issue and there was not an imminent likelihood he would become violent. *Id.* at 379. By contrast, Dr. Wilharm testified E.L. engaged in "threatening" and "very out-of-the-ordinary bizarre behaviors." Dr. Keller's report indicated without treatment E.L.'s "thinking, mood and behaviors would rapidly decompensate, leading to events similar to those that brought him to the hospital." E.L. was not simply provoking acts of aggression toward himself. Because of his disorganized thinking, he misunderstood the actions of others and responded aggressively. In addition, the Abbe Center staff reported recent incidents where E.L. threw items from a second floor deck believing they were possessed and screamed about "rapists" while "grabbing himself (sexually) in public." E.L. was not confined "simply because [his] conduct was unusual or bizarre." *See id.* His verbal abuse was coupled with intimidating physical actions. We conclude the evidence was sufficient to support the district court's finding that E.L. was likely to physically injure himself or others if released without treatment.

**AFFIRMED.**